LEWIS v. WOLVERINE COAL CO.

1. Master and Servant — Railroads—Operation of Cars—Rolling Stock—Size—Negligence.

Where plaintiff, who was in the employment of defendant railroad company as a "boss trimmer," having control of the loading and shipment of cars of coal and charged with the duty of selecting the proper cars for such work of loading, in the process of which the cars were placed under a chute and filled by plaintiff and his assistants, and where plaintiff was injured in starting a car while he was between it and a support of the loader the plaintiff was not entitled to recover for alleged negligence of the defendant in having posts of the loading device in dangerous proximity to the rails, or because it provided an unusually wide car for the operation.

2. Same—Assumed Risk—Personal Injuries—Width of Cars.

The trial court should have directed a verdict in favor of the defendant company on the ground of contributory negligence of the plaintiff when it appeared that he observed the dangerous proximity of the car to the post before he attempted to move the car and placed his body voluntarily in such a position as to endanger himself in moving the freight car from under the apparatus.

3. Same—Evidence—Custom.

It was also error, in the face of evidence in defendant's behalf that the cars varied a considerable amount in width and that the car which caused plaintiff's injuries

was not among the widest employed for that purpose, to submit to the jury plaintiff's claim that there was a customary and usual width of cars and that the one which caused plaintiff's injury was unusually wide.

4. SAME—CONTRIBUTORY NEGLIGENCE.

Plaintiff, having authority to select the cars to be loaded with coal and to reject those which were improper or insufficient for that purpose, assumed the risk of selecting and employing a car which was too wide to enable him to safely release it while he was between the post of the loading apparatus and the moving car; since the danger was or ought to have been obvious.

Error to Bay; Collins, J.  Submitted April 9, 1915. (Docket No. 34.)  Decided June 7, 1915.

Case by Emry J. Lewis against the Wolverine Coal Company and another for personal injuries. Judgment for plaintiff against the defendant named, which brings error.  Reversed, and no new trial granted.

*Gillett & Clark,* for appellant.

*Charles W. Hitchcock,* for appellee.

On November 22, 1911, plaintiff was crushed between the rear end of a coal car and one of the posts which supported a coal "tipple." He brought suit against the Pere Marquette Railroad Company and the appellant, as joint tort-feasors.  Upon the trial a verdict was directed in favor of the defendant railroad company, and, as the plaintiff does not appeal from such action of the court, that defendant is not now interested.

It appears that the plaintiff had been an employee of the defendant for three years or more—the first year underground; the second as "extra man above ground;" and the last year before his injury as "boss trimmer."  As "boss trimmer" he had working under him a "helper" and a "car dropper."  His duties

as "trimmer" required him, with the assistance of his "helper," to pick out the dirt, rock, and impurities from the coal and spread the coal properly in the car as it was received from the "tipple." The track ran north and south under the "tipple," and was so inclined toward the north that storage cars standing to the south thereof would approach and pass under the "tipple," by gravity, when released. It was the duty of the "car dropper" to permit the cars to drop down to the "tipple" when required for loading. The customary method of performing this operation was to block the car with a piece of wood as soon as the front end of the car was in proper position to receive the coal from the "tipple." When a sufficient quantity had been received in that end of the car, the block was removed, and it was permitted to go to the north a few feet, when a further quantity of coal was loaded, and that operation was repeated four or five times, until the southerly or rear end of the car was immediately under the "tipple," at which time the northerly or loaded end would be for a considerable distance outside the "tipple" and its supports. When the car was completely loaded it was customary for the plaintiff to climb down from the car, leaving his "helper" on top to control its movement by the brakes, and to himself remove the block and permit the car to pass to the north onto the siding, thus making room under the "tipple" for its successor. The "tipple" was supported by eight wooden posts standing at slightly varying distances from the rails. Those on the westerly side were respectively 3 feet $4\frac{3}{4}$ inches, 3 feet 3 inches, 3 feet 3 inches, and 3 feet $4\frac{1}{4}$ inches from the rail. The post at which plaintiff received his injury was the second nearest one to the north, and was 3 feet 3 inches from the rail.

On direct examination the plaintiff described his accident as follows:

"On the day of the accident I was working on the east track. That track extends north and south. When it goes north of the shed of the tipple, it keeps going north. After I got through with a car after it is loaded, the other trimmer takes it out and finishes it off. The tracks south of the tipple are on an incline which we call the hill. That part of the yard was used for storing cars. On this track this day there were probably a dozen cars up on the hill. I couldn't say for sure. William Campbell had the task this day of dropping the cars down to me. We call his work 'dropping flats.' He always dropped it down, and I would knock the block out and let this other go on out. These cars were held back on the place we call 'up on the hill' by wooden blocks placed under the front wheel—any wooden block you could get hold of. The fellow that dropped the cars down would take the block out from under one and put it under another. Sometimes the car would start, and sometimes he would have to pinch it with a pinch bar. When the car started down he had to run to catch it. After it got to the shed, after it was placed under the tipple, we would load it as far as the dump would reach. I would holler, 'Go ahead,' and he would let the car go and stop it again. When the car was first placed down there five or six feet of it was under the dump. I always blocked the front end. I mean by that that I blocked the front wheel with a piece of wood. On the day of the injury I got back up on the car and went to trimming again. To get the coal into the car I had to pull a rope; there is a rope that dumps the big pan. The amount dumped at a time was sometimes more and less, maybe 700 or 800 pounds, sometimes maybe a couple of tons. Then I would let go of the rope, and the dump would go back. When we got that portion of the car filled up the fellow dropping the car would holler, 'Go ahead,' and he would drop the car down a little ways. Mr. Campbell did that this day. Mr. Klopf stayed on the car. Campbell would drop the car down by taking a piece of gas pipe and knocking the block of wood out and letting it go. He would stop it again with a block of wood.

"*Q.* After you got this car filled on this particular day, what was then required of you?

"*A.* Get off the car and knock the block from under the hind wheel. I got off the car to knock the block out, and the car was so wide I could not reach the block. I would knock it out, and the car would keep running onto it, and I got down close to the post, and I don't know for sure whether it was the step caught me in the hip, shoved me in around this post, kind of crowded me right in, and caught this left side of me. I was on the west side of the track. On that side of the track there are four posts or timbers that support the dump or tipple. I would judge they were 12 or 13, maybe 14 inches square. The two center ones were about 6 or 8 feet apart, I should judge. The others—the outside posts—probably 18 inches apart. There is two on the north and two on the south. I was hurt by the south post on the north side.

"*Q.* Show the jury what you did and what you had to do with running the car.

"*A.* Same as if this was the car here, I knocked the block out of the wheel here, and I could not get out, and the car kept running down on to me, and squeezed me between the two posts. I was hit in the hip, and the post caught me in the shoulder, here in the breast. Adam Klopf jumped off the car and picked me up. The posts where I was squeezed were the two northerly posts on the west side. To knock out the block I used a piece of gas pipe. That is what we had there for that purpose, and always wooden blocks were used.

"*Q.* Do you know whether or not a man can run a car down there and use the brakes to hold it as you are required to?

"*A.* I have never seen any car there, because the brakes would not hold on two-thirds of them if you did try them.

"*Q.* You have to drop this car 3 or 4 feet; then stop it and go ahead again?

"*A.* Yes, sir; a man don't have very much time to lose; if he does, he is liable to get a chunk of coal on top of the head."

On cross-examination he testified:

"*Q.* I suppose a man could not work around cars

without noticing the names of the cars and the different railroads.

"*A.* Oh, sure; some of those roads would be Western roads, some Eastern, some Southern, and some Michigan roads. Cars were there from all over the world. It is pretty near correct to say that hardly two cars in succession would be the same kind of cars. * * *

"*Q.* Some have steps on all four corners, and others have steps on only two corners; that is true, isn't it?

"*A.* I don't know as I remember seeing them on all four corners. Some have what they call the platform of the car higher from the ground than others. Some boxes are higher, and I have noticed that they differ in width also. There is no regular standard width of coal cars that I know of. I don't think that there is any regular standard in other respects. I am no railroad man."

Several of plaintiff's witnesses testified that the cars in common use were of varying widths. Records with accurate measurements were introduced by the defendants, from which it conclusively appears that during the year plaintiff had acted as "boss trimmer" he had loaded at least 883 cars. Of these the outside measurement of 789 was given. To show the extreme variations in width, the following table is inserted:

| Width. | No. of Cars Whose Inside Width is. | No. of Cars Whose Outside Width is. |
|---|---|---|
| 7' 6½" | 1 | |
| 7' 7" | 1 | |
| 8 to 9 ft. | | 16 |
| 8' to 8' 6" | 6 | 130 |
| 8' 6" to 9' | 26 | 73 |
| 9' to 9' 6" | 21 | 42 |
| 9' 6" to 9' 9" | 18 | 209 |
| 9' 9" | | 8 |
| 9' 9¼" | | 1 |
| 9' 9½" | | 2 |
| 9' 10" | | 8 |
| 9' 10" plus | | 1 |

| Width. | No. of Cars Whose Inside Width is. | No. of Cars Whose Outside Width is. |
|---|---|---|
| 9' 10½" ............................ | ........ | 4 |
| 9' 10¾" ............................ | ........ | 3 |
| 9' 11" ............................. | ........ | 29 |
| 9' 11¼" ............................ | ........ | 19 |
| 9' 0½" or 9' 11½" .................. | ........ | 3 |
| 9' 11½" ............................ | ........ | 4 |
| 9' 11¾" ............................ | ........ | 1 |
| 9' 11⅞" ............................ | ........ | 1 |
| 10' ................................ | ........ | 34 |
| 10' 0¼" ............................ | ........ | 1 |
| 10' 0¼" plus ....................... | ........ | 10 |
| 10' 0½" ............................ | ........ | 11 |
| 10' 0⅝" ............................ | ........ | 1 |
| 10' 0½" plus ....................... | ........ | 1 |
| 10' 1" ............................. | ........ | 32 |
| 10' 1" plus ........................ | ........ | 5 |
| 10' 1¾" ............................ | ........ | 6 |
| 10' 2" ............................. | ........ | 1 |
| 10' 2" (?)......................... | ........ | 4 |
| 10' 2¼" ............................ | ........ | 1 |
| 10' 2½" ............................ | ........ | 22 |
| 10' 2¾" ............................ | ........ | 1 |
| 10' 3" ............................. | ........ | 5 |
| Total......................... | 73 | 789 |

The plaintiff was unable to identify the car which caused the injury. Defendant, however, by means of a record which it kept of the cars loaded each day was able to determine that the injury was caused by one of two cars, either Lake Shore No. 54,301 or Hocking Valley No. 25,215. The Lake Shore car was a steel car, and the Hocking Valley a wooden car. Inasmuch as two of plaintiff's witnesses testified that the car which caused the injury was a wooden car, the conclusion is almost irresistible that plaintiff was injured by the Hocking Valley car. The Hocking Valley car had an outside measurement of 9 feet 8½ inches; the Lake Shore car an inside measurement of 9 feet 7 inches, and an outside measurement of ap-

proximately 10 feet ¼ inch. An examination of the foregoing table will show that during the year preceding his injury the plaintiff had loaded at least 80 cars of a greater width than the one which caused his injury, even presuming it to have been caused by the Lake Shore car. Plaintiff himself was in control of the operation, and it was his duty to reject any cars not suitable for loading, and to permit them to pass under the "tipple" empty.

The declaration contains four distinct allegations of negligence:

(1) The use of an unusually wide car.

(2) The position of the posts in dangerous proximity to the rails.

(3) An unsafe method of holding the car in place.

(4) Lack of warning.

The learned circuit judge determined that as to the second, third, and fourth grounds of alleged negligence the defendant must prevail. He submitted the case to the jury on the first ground, charging them, in part, as follows:

"Now, gentlemen of the jury, if it is a fact that there is customary and usual width of cars, that is, that before this accident there was a customary and usual width of cars known and understood by the plaintiff and defendant, if the point of fact is established, and if it is further a fact that at the time of the accident a car was sent over the tracks beyond the tipple to be handled in loading the car, which car was of unusual width, if you find that to be a fact, and also if you find that the plaintiff, while doing that work there from the time, during all the time, that that car was handled, used reasonable care and diligence in all of the respects which I have described, and by reasonable care and diligence I mean used that reasonable care and diligence that would be expected or ought to be used by a reasonable and prudent person about the work that he was doing, considering the kind of work, if he used reasonable care and diligence to observe the car and observed the way the

work was going on, but did not, notwithstanding the use of that reasonable diligence, observe that the car was of unusual width, and that in handling the car in a reasonable and prudent manner he was caught between the car and the tipple walls and was injured, and that that injury was occasioned by the fact of this excess width of the car, and that the accident would not have happened if the car had been a car of the ordinary and customary width, then the plaintiff is entitled to a verdict at your hands, unless it can be said, as a matter of law, that the plaintiff assumed the risk; upon that—upon the assumed risk question—I will charge you later.  *  *  *

"By assuming the risk is meant that the risk was one of the ordinary risks of the business, or else the risk or danger was of such a kind that plaintiff knew and understood or ought to have known and understood such risk and danger. Where the risk or danger is of such a kind that it can be seen and understood by workmen, it is the law of this State that he cannot recover any damages, even though the employer may be negligent, and the workman may be free from negligence. In such a case the defendant is not required to take any better care of the plaintiff than plaintiff takes of himself, and if the plaintiff can see and understand the danger, and keeps on working without complaint, he assumes the risk or takes his own chances and cannot recover."

Under this charge a verdict was rendered in favor of the plaintiff in the sum of $4,525.

BROOKE, C. J. (*after stating the facts*). We are of opinion that in dealing with the last three grounds of alleged negligence the learned circuit judge reached a proper conclusion. The sole question remaining, therefore, is whether he committed error in submitting the case to the jury upon the first ground; *i. e.*, that it was negligence on the part of the defendant to use an unusually wide car. We are convinced that as to this aspect of the case the learned trial judge reached an erroneous conclusion.

The situation presented by this record is peculiar,

in that the plaintiff himself, a man of maturity, and who had most ample experience, not only had power to reject a car which was unfit for loading, but himself controlled every movement of the car. Furthermore, he himself set the car in motion at the identical moment he received his injury. When he stooped to release the block he noticed the proximity of the car to the post, for he testified:

"I got off the car to knock the block out, and the car was so wide I could not reach the block."

The method of blocking and unblocking the car to hold it as required was of the plaintiff's own selection. The cars were provided with brakes, and it must be presumed that they could have been used for that purpose. Plaintiff's testimony to the effect that two-thirds of them would not work must be disregarded in the light of the fact that he testified that no attempt was made to hold the car which caused the injury by such means. The conclusion is irresistible that in knocking the block out from under the hind wheels of the car with his body in such a position that it would be caught by the car which would instantly start when released, as he well knew, plaintiff was guilty of such contributory negligence as would absolutely preclude his recovery. The charge of the court upon which recovery is predicated permitted the jury to find that there was a "customary and usual width of cars," whereas the proof conclusively demonstrated that there was no such customary or usual width, that the cars varied in width from 7 feet 6 inches to 10 feet 3 inches, and that they varied in width from car to car, and the evidence further conclusively established the fact that the car which caused the injury was not among the widest of those commonly in use. In the face of such positive proof, it was improper to permit the jury to find, as a fact, that there was a customary and usual width of cars,

and that the one which caused the injury was one unusually wide.

But, even if the car in question had been unusually wide, if such unusual width was such as to make it improper to load, it should have been rejected by the plaintiff. Not having so rejected it, but having loaded it, and being, as he testified, aware of its unusual width, when he went to remove the block for the last time, he must be held to have assumed the risk of that act, the danger of which was or should have been entirely apparent to him.

We believe the citation of authorities to sustain the conclusions here reached is unnecessary.

The judgment is reversed, and there will be no new trial.

McALVAY, KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.